UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
                                         :
FBG WALL LLC,                            :
                                         :
                Plaintiff,               :  Case No.
                                         :
        - against -                      :  COMPLAINT
                                         :
WAL-MART REAL ESTATE BUSINESS TRUST,     :
                                         :
                Defendant.               :
----------------------------------------x



08 CIV. 1255

        Plaintiff, by and through its attorneys Aronauer, Re &
Yudell, LLP, complaining of the Defendants, alleges the
following:

### Parties

#### Plaintiff

        1.    Plaintiff FBG Wall LLC ("Plaintiff" or "FBG") is a
limited liability company with its office at c/o RD Management
Corp., 810 Seventh Avenue, 28th Floor, New York, New York.

        2.    As shown in greater detail below, for the purpose
of diversity jurisdiction, Plaintiff is deemed to be a citizen of
the States of New York, Connecticut, California and Illinois.

        3.    Plaintiff is a limited liability corporation, the
sole member of which, FBG Owners, LLC ("FBG Owners"), is also a
limited liability company.

4.   The members of FBG Owners are: Abraham Goldberger; Alex Goldberger; and FB Harriman Business Park Associates, a general partnership.

5.   Abraham Goldberger is a citizen of the State of New York.

6.   Alex Goldberger is a citizen of the State of New York.

7.   The general partners of FB Harriman Business Park Associates are: the Trust under the Will of Irving Goldberg for the benefit of Richard Goldberg (the "Goldberg Trust"); and MFB Realty LLC ("MFB Realty"), a limited liability company.

8.   The trustees of the Goldberg Trust are: Richard Goldberg, a citizen of the State of New York; Paul Goldberg, a citizen of the State of Connecticut; and Robert Helpern, a citizen of the State of New York.

9.   The members of MFB Realty are: Jay Furman; Richard J. Birdoff; MF Est. LLC; Jay-Bob Associates; and Furman-Murray Associates.

10.   Jay Furman is a citizen of the State of New York.

11.   Richard J. Birdoff is a citizen of the State of New York.

12.   MF Est. LLC is a limited liability company whose members are: Jay Furman; Barbara Murray; Vicki Murray Birdoff; Erica Murray; Bruce Murray; Jay Furman as Trustee of the Jason

Furman Trust; and Jay Furman as Trustee of the Jesse Furman Trust.

13.  Jay Furman, Barbara Murray and Vicki Murray Birdoff, are citizens of the State of New York.  Erica Murray is a citizen of the State of California.  Bruce Murray is a citizen of the State of Illinois.

14.  Jay-Bob Associates is a general partnership in which Robert P. Murray, Vicki Murray Birdoff, Erica Murray, Bruce Murray, Jay Furman, Jay Furman as Trustee of the Jason Furman Trust and Jay Furman as Trustee of the Jesse Furman Trust, are the partners.

15.  Robert P. Murray is a citizen of the State of New York.

16.  The citizenship of each of the other partners in Jay-Bob Associates is discussed in ¶ 13 above.

17.  Furman-Murray Associates is a limited partnership in which Robert P. Murray and Jay Furman are the general partners and Vicki Murray Birdoff, Erica Murray, Bruce Murray, Robert P. Murray, Jay Furman, Jay Furman as Trustee of the Jason Furman Trust, Jay Furman as Trustee of the Jesse Furman Trust and MF Est. LLC, are the limited partners.

18.  The citizenship of each of the partners in Furman-Murray Associates is discussed in ¶¶ 12 - 16 above.

**Defendant**

19.   Upon information and belief, defendant Wal-Mart Real Estate Business Trust ("Wal-Mart REBT") is a Delaware business trust with an office at 702 S.W. Eighth Street, Bentonville, Arkansas, and a mailing address at 2001 SE 10th Street, Bentonville, Arkansas 72716.

20.   Upon information and belief, the trustees of Wal-Mart REBT are the Wilmington Trust Company and David Glass.

21.   Upon information and belief, the Wilmington Trust Company is a Delaware corporation with its principal place of business located at Rodney Square North, 1100 N. Market Street, Wilmington, Delaware.

22.   Upon information and belief, David Glass is a citizen of the State of Arkansas.

23.   Accordingly, for the purposes of diversity jurisdiction, the Defendant is a citizen of the States of Delaware and Arkansas.

## Jurisdiction and Venue

24.   This Court has jurisdiction over the claims set forth herein pursuant to 28 U.S.C. § 1332 inasmuch as the action is between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4

25.   Venue is appropriate in this District pursuant to the provisions of 28 U.S.C. § 1391(a) since a substantial part of the events and omissions giving rise to the claim occurred in this District and the real property involved in this action is located in this District.

26.   In addition, venue is appropriate in this District pursuant to the agreement between the parties hereto.

27.   The Lease which is the subject matter of this action (see ¶¶ 28 - 42 below) specifically provides: "This Agreement shall be interpreted and construed in accordance with the laws of the State of New York and any dispute with respect to it and the rights and duties thereby created shall be litigated in U.S. District Court for the State of New York."

## The Lease

28.   In or about August 1999, FBG Harriman, L.L.C., as Lessor, and Defendant Wal-Mart REBT, as Lessee, entered into a Lease Agreement dated as of August 20, 1998 (the "Lease") pursuant to which Wal-Mart REBT was to lease from Plaintiff a specified portion (the "Demised Premises") of the shopping center (the "Shopping Center") located in the Towns of Monroe and Woodbury in Orange County, New York.

29.   A true copy of the Lease is annexed hereto as Exhibit A and is incorporated herein by reference.

30.    Plaintiff is the successor in interest to FBG Harriman, L.L.C. and is the Lessor under the Lease.

31.    The Shopping Center is also known as "Harriman Commons."

32.    The Lease sets forth the various rights and obligations of the parties thereto with respect to the Demised Premises and Shopping Center.

33.    Paragraph 30 of the Lease sets forth Wal-Wart REBT's obligation to pay its pro rata share of the common area maintenance ("CAM") expenses incurred by Plaintiff in connection with the maintenance and repair of the common areas (the "Common Areas") of the Shopping Center.   (See Exhibit A: Lease, at ¶ 30.)

34.    The Common Areas include, among other things, "common roadways, service areas, driveways, area of ingress and egress, sidewalks and other pedestrian ways, . . . storm water detention and retention ponds located within the Shopping Center or offsite wetlands areas."   (See Exhibit A: Lease, at ¶ 30.)

35.    Thus, the CAM expenses of which Wal-Mart REBT is to pay its pro rata share include costs and expenses incurred in connection with the roadways in and around the Shopping Center. (See Exhibit A: Lease, at ¶ 30.)

36.    The CAM expenses of which Wal-Mart REBT is to pay its pro rata share include expenses for maintaining and repairing the storm water detention and retention ponds located within the

6

Shopping Center or offsite wetlands areas (the "Detention Pond Maintenance Expenses"). (See Exhibit A: Lease, at ¶ 30.)

37.  The CAM expenses of which Wal-Mart REBT is to pay its pro rata share include expenses for maintaining and repairing the pylon sign (the "Pylon Sign Expenses") at the Shopping Center. (See Exhibit A: Lease, at ¶¶ 8 and 30.)

38.  The CAM expenses of which Wal-Mart REBT is to pay its pro rata share include the cost of liability insurance, property damage and all-risk hazard insurance on the Common Areas, buildings, appurtenances and other improvements constituting the Shopping Center. (See Exhibit A: Lease, at ¶ 30(f).)

39.  The CAM expenses of which Wal-Mart REBT is to pay its pro rata share include expenses for security services at the Shopping Center.

40.  Paragraph 30 of the Lease specifically provides that "[t]he maintenance by Lessor is to include the following: . . . (g) Security services shall not be charged or prorated hereunder to Lessee unless specifically approved in writing by Lessee prior to Lessor contracting for or performing such services; [and] (h) *Any additional requirements enumerated in the municipal approvals of the Shopping Center*." (See Exhibit A: Lease, at ¶ 30 (emphasis added).)

41.  Paragraph 30 of the Lease continues: "Lessee shall pay to Lessor its prorata [sic] share of the cost of said

maintenance and repairs determined by dividing the square footage of the Demised Premises by the total building square footage of the Shopping Center."  (See Exhibit A: Lease, at ¶ 30.)

42.   Paragraph 29 of the Lease provides: "Lessor and Lessee covenant that whenever their consent or approval is required hereunder, they will not unreasonably withhold or delay such consent or approval."

## Required Security Services
## at the Shopping Center

43.   As part of the municipal approvals for the Shopping Center, the Towns of Woodbury and Monroe required that private security be provided at the Shopping Center.

## The Monroe Planning Board Resolution

44.   Specifically, pursuant to the "Resolution and Record of Decision of the Planning Board of the Town of Monroe, New York" dated March 16, 1999 (The "Monroe Planning Board Resolution"), the Planning Board for the Town of Monroe issued its conditional final site plan approval for the Shopping Center.

45.   A copy of the March 16, 1999 Monroe Planning Board Resolution is annexed hereto as Exhibit B.

46.   The conditional final site plan approval for the Shopping Center was expressly subject to the "Town of Monroe Planning Board Site Plan Determinations and Findings for Harriman

8

Commons" and the conditions of approval attached to the Monroe
Planning Board Resolution as Schedules A through L.  (See Exhibit
B: Monroe Planning Board Resolution, at p. 3, item 4 and the
documents and schedules annexed thereto.)

47.  Schedule G attached to the Monroe Planning Board
Resolution contains requirements and conditions of approval
related to utilities and community services at the Shopping
Center.

48.  Items G12 through G16 of Schedule G of the Site
Plan Approval Conditions dated March 16, 1999 specify the
requirement that the Shopping Center provide a private security
force.  (See Exhibit B: Monroe Planning Board Resolution,
Schedule G, pp. 22 - 23.)

49.  Specifically, the Site Plan Approval Conditions
dated March 16, 1999 provide:

> G12.  Harriman Commons shall
> provide a security force to reduce
> non-emergency calls requiring
> response by Woodbury or State
> Police Departments.
>
> G13.  The security program at
> Harriman Commons shall be augmented
> in accordance with Agreements
> between Harriman Commons and the
> Woodbury and State Police
> Departments through ongoing
> Emergency Services Organization
> (ESO) discussions after the site is
> developed.  If the ESO determines
> that changed circumstances or
> unanticipated security concerns
> involving the Harriman Commons
> project requires the provision of
> additional security or security

measures, the owner and/or affected tenants will modify its security plan to incorporate additional security measures that adequately address those concerns.

G13. [sic] The security system shall include the use of marked security vehicle(s) and uniformed security personnel, and shall provide services at no lower standard and for no fewer hours and no lesser time periods than those listed in the security report incorporated within the FSEIS.

G14.  The Harriman Commons security patrol shall be responsible for routine traffic control on the Harriman Commons site.  This patrol shall among other things monitor fire lanes, no parking/no standing zones, handicapped parking, the general safety of parked vehicles and other traffic control measures. This patrol force shall be supplemented on holiday and other peak periods in accordance with the needs of the center as reviewed at ESO meetings.

G15.  Patrol of the Harriman Commons development shall be provided from opening to one (1) hour after closing of the theater as a minimum.

G16.  Security personnel shall be trained by the BOCES Program or its equivalent for first aid and CPR.

(See Exhibit B: Monroe Planning Board Resolution, at Schedule G, pp. 22 - 23.)

50.   Thus, the hiring of private security at the Shopping Center was specifically required by the Town of Monroe Planning Board in its approval of the Shopping Center.

10

## The Woodbury Planning Board Resolution

51.    Pursuant to the "Resolution of Conditional Approval for Site Plan & Special Permit for Harriman Commons, RD Management Corp." adopted May 5, 1999 (the "Woodbury Planning Board Resolution"), the Planning Board for the Town of Woodbury issued its approval for the Shopping Center.

52.    A copy of the Woodbury Planning Board Resolution is annexed hereto as Exhibit C.

53.    The site plan approval for the Shopping Center was expressly subject to the "Special Conditions" attached to the Woodbury Planning Board Resolution as Schedules A through L. (See Exhibit C: Woodbury Planning Board Resolution, at SP-5 and the documents and schedules annexed thereto.)

54.    The schedules attached to the Woodbury Planning Board Resolution are virtually identical to the schedules attached to the Monroe Planning Board Resolution.

55.    Schedule G attached to the Woodbury Planning Board Resolution contains requirements and conditions of approval related to utilities and community services at the Shopping Center.

56.    Items 130 through 138 of the Site Plan Approval Conditions dated June 7, 1999 specify the requirement that the Shopping Center provide a private security force.  (See Exhibit C: Woodbury Planning Board Resolution, Schedule G, pp. 22 - 23.)

11

57.   Specifically, the Site Plan Approval Conditions

dated June 7, 1999 provide:

> 133. G12.   Harriman Commons shall
> provide a security force to reduce
> non-emergency calls requiring
> response by Woodbury or State
> Police Departments.
>
> 134. G13.   The security program at
> Harriman Commons shall be augmented
> in accordance with Agreements
> between Harriman Commons and the
> Woodbury and State Police
> Departments through ongoing
> Emergency Services Organization
> (ESO) discussions after the site is
> developed.   If the ESO determines
> that changed circumstances or
> unanticipated security concerns
> involving the Harriman Commons
> project requires the provision of
> additional security or security
> measures, the owner and/or affected
> tenants will modify its security
> plan to incorporate additional
> security measures that adequately
> address those concerns.
>
> 135. G13.   [sic] The security
> system shall include the use of
> marked security vehicle(s) and
> uniformed security personnel, and
> shall provide services at no lower
> standard and for no fewer hours and
> no lesser time periods than those
> listed in the security report
> incorporated within the FSEIS.
>
> 136. G14.   The Harriman Commons
> security patrol shall be
> responsible for routine traffic
> control on the Harriman Commons
> site.   This patrol shall among
> other things monitor fire lanes, no
> parking/no standing zones,
> handicapped parking, the general
> safety of parked vehicles and other
> traffic control measures.   This

patrol force shall be supplemented
on holiday and other peak periods
in accordance with the needs of the
center as reviewed at ESO meetings.

137. G15.  Patrol of the Harriman
Commons development shall be
provided from opening to one (1)
hour after closing of the theater
as a minimum.

138. G16.  Security personnel shall
be trained by the BOCES Program or
its equivalent for first aid and
CPR.

(See Exhibit C: Woodbury Planning Board Resolution, at Schedule

G, pp. 22 - 23.)

58.  Thus, the hiring of private security at the

Shopping Center was specifically required by the Town of Woodbury

Planning Board in its approval of the Shopping Center.

**Notice to Wal-Mart REBT**

59.  By letter dated September 18, 2000, Plaintiff

notified Defendant of the hiring of a security company to

implement the required security plan.

60.  A copy of the September 18, 2000 letter from

Plaintiff to Defendant (the "September 18, 2000 Notification

Letter"), without enclosures, is annexed hereto as Exhibit D.

61.  The September 18, 2000 Notification Letter further

advised that "[t]hese costs [of the security services] will be

passed through to all tenants as part of common area maintenance

area expenses." (See Exhibit D: September 18, 2000 Notification Letter.)

62. Defendant did not object to or otherwise respond to the September 18, 2000 Notification Letter.

## Amounts Due

63. Defendant Wal-Mart REBT took possession of the Demised Premises in or about September 2000.

64. Thereafter, pursuant to the terms of the Lease, Plaintiff sent invoices to Defendant billing Defendant for its share of the CAM and other expenses due under the Lease.

## The Invoices for General CAM Expenses

65. Collectively annexed hereto as Exhibit E are copies of invoices sent by Plaintiff to Defendant for CAM expenses, including general CAM (common area maintenance), security and other maintenance and landscaping, between October 2000 and December 31, 2002.

66. Defendant paid the general CAM expenses billed under the invoices annexed as Exhibit E.

67. Collectively annexed hereto as Exhibit F are copies of invoices sent by Plaintiff to Defendant for CAM expenses, including general CAM (common area maintenance),

security and other maintenance and landscaping, between January 1, 2003 the present.

68.   Defendant did not pay all of the general CAM expenses due under the invoices annexed as Exhibit F.

69.   By a revised invoice dated July 28, 2003, Plaintiff billed Defendant $31,053.96 for its pro rata share of various expenses, which included $7,879.37 representing Defendant's pro rata share of general CAM expenses for the period January 1, 2003 through March 31, 2003.  (See Exhibit F.)

70.   Defendant paid the amount billed for general CAM expenses for the period January 1, 2003 through March 31, 2003.

71.   By a revised invoice dated April 13, 2004, Plaintiff billed Defendant $33,419.80 for its pro rata share of various expenses, which included $5,872.92 representing Defendant's pro rata share of general CAM expenses for the period April 1, 2003 through June 30, 2003.  (See Exhibit F.)

72.   Defendant paid the amount billed for general CAM expenses for the period April 1, 2003 through June 30, 2003.

73.   By invoice dated November 18, 2004, Plaintiff billed Defendant $66,494.29 for its pro rata share of various expenses, which included $14,850.13 representing Defendant's pro rata share of CAM expenses for the time period July 1, 2003 through December 31, 2003.  (See Exhibit F.)

74.   Defendant paid no part of the CAM expenses billed for the time period July 1, 2003 through December 31, 2003.

75.  By invoice dated July 8, 2005, Plaintiff billed Defendant $29,098.42 representing Defendant's pro rata share of general CAM expenses for the calendar year 2004.  (See Exhibit F.)

76.  Defendant paid the amount billed for general CAM expenses for the calendar year 2004.

77.  By invoice dated July 8, 2005, Plaintiff billed Defendant $35,718.71 for its pro rata share of various expenses, which included $10,589.86 representing Defendant's pro rata share of general CAM expenses for the time period January 1, 2005 through March 31, 2005.  (See Exhibit F.)

78.  Defendant has paid no part of the amounts billed for general CAM expenses for the period January 1, 2005 through March 31, 2005.

79.  By invoice dated October 25, 2005, Plaintiff billed Defendant $50,596.06 for its pro rata share of various expenses, which included $15,649.45 representing Defendant's pro rata share of general CAM expenses for the time period April 1, 2005 through June 30, 2005.  (See Exhibit F.)

80.  Defendant has failed and refused to pay the general CAM expenses billed for the period April 1, 2005 through June 30, 2005.

81.  By invoice dated October 25, 2005, Plaintiff billed Defendant $20,594.08 for its pro rata share of various expenses, which included $2,849.80 representing Defendant's pro

rata share of the general CAM expenses for the time period July 1, 2005 through September 30, 2005.  (See Exhibit F.)

82.    Defendant has failed and refused to pay the amount billed for general CAM expenses for the period July 1, 2005 through September 30, 2005.

83.    By invoice dated November 13, 2006, Plaintiff billed Defendant $79,287.65 for its pro rata share of various expenses, which included $36,461.71 representing Defendant's pro rata share of the general CAM expenses for the year January 1, 2005 through December 31, 2005.  (See Exhibit F.)

84.    The $36,461.71 billed for general CAM expenses for the year January 1, 2005 through December 31, 2005 includes $29,089.11 previously billed to Defendant for general CAM expenses for the period January 1, 2005 through September 30, 2005.

85.    Defendant has failed and refused to pay the amount billed for general CAM expenses for the period January 1, 2005 through December 31, 2005.

86.    By invoice dated August 6, 2007, Plaintiff billed Defendant $185,155.47 for its pro rata share of various expenses, which included $40,930.81 representing Defendant's pro rata share of the general CAM expenses for the time period January 1, 2006 through December 31, 2006.  (See Exhibit F.)

87.   Defendant has failed and refused to pay the amount billed for general CAM expenses for the period January 1, 2006 through December 31, 2006.

88.   By invoice dated August 17, 2007, Plaintiff billed Defendant $670.82 for its pro rata share of the real estate taxes on the common roadways for the year 2006.   (See Exhibit F.)

89.   Defendant has failed and refused to pay the amount billed for its pro rata share of the real estate taxes on the common roadways for the year 2006.

90.   By invoice dated September 2, 2007, Plaintiff billed Defendant $50,421.69 for its pro rata share of various expenses, which included $3,753.79 representing Defendant's pro rata share of the general CAM expenses for the time period January 1, 2007 through June 30, 2007.   (See Exhibit F.)

91.   Defendant has failed and refused to pay the amount billed for general CAM expenses for the period January 1, 2007 through June 30, 2007.

92.   The amounts due for general CAM expenses detailed above are summarized in the following chart:

| Period Covered | Date of Invoice | Paragraphs of Complaint | Complaint Exhibit | Amount Past Due |
|---|---|---|---|---|
| 7/1/03 - 12/31/03 | 11/18/04 | 73-74 | F | $ 14,850.13 |
| 1/1/05 - 12/31/05 | 7/8/05 10/25/05 10/25/05 11/13/06 | 77-85 | F | 36,461.71 |

| 1/1/06 - 12/31/06 | 8/6/07 | 86-87 | F | 40,930.81 |
|---|---|---|---|---|
| 1/1/06 - 12/31/06 | 8/17/07 | 88-89 | F | 670.82 |
| 1/1/07 - 6/30/07 | 9/2/07 | 90-91 | F | 3,753.79 |
| | | | | |
| Total: General CAM | | | | $ 96,667.13 |

## The Invoices for Pylon Sign Expenses

93.   In addition to the invoices set forth above, pursuant to the terms of the Lease, Plaintiff provided to Defendant invoices for Defendant's share of the Pylon Sign Expenses at the Shopping Center.

94.   Defendant paid some of the invoices for the Pylon Sign Expenses while failing to pay all or a portion of others.

95.   Copies of invoices sent to Defendant for Defendant's share of the Pylon Sign Expenses at the Shopping Center between October 1, 2002 and the present are collectively annexed hereto as Exhibit G.

96.   By invoice dated May 20, 2003, Plaintiff billed Defendant the sum of $1,131.59 representing Defendant's share of the Pylon Sign Expenses for the time period October 1, 2002 through December 31, 2002.

97.  Of that sum due for Defendant's share of the Pylon Sign Expenses for the time period October 1, 2002 through December 31, 2002, Defendant paid $1,121.03.

98.  Accordingly, the sum of $10.56 was still due and owing under the May 20, 2003 invoice for Defendant's share of the Pylon Sign Expenses for the period October 1, 2002 through December 31, 2002.

99.  By a revised invoice dated May 20, 2003, Plaintiff billed Defendant for the balance of $10.56 still due and owing for Defendant's share of the Pylon Sign Expenses for the time period October 1, 2002 through December 31, 2002.  (See Exhibit G.)

100. By invoice dated July 28, 2003, Plaintiff billed Defendant the sum of $1,245.94 representing Defendant's share of the Pylon Sign Expenses for the time period January 1, 2003 through March 31, 2003.

101. Of that sum due for the Defendant's share of the Pylon Sign Expenses for the period January 1, 2003 through March 31, 2003, Defendant paid $1,084.61.

102. Accordingly, the sum of $161.33 was still due and owing under the July 28, 2003 invoice for Defendant's share of the Pylon Sign Expenses for the period January 1, 2003 through March 31, 2003.

103. By a revised invoice dated July 28, 2003, Plaintiff billed Defendant for the balance of $161.33 still due

and owing for Defendant's share of the Pylon Sign Expenses for the time period January 1, 2003 through March 31, 2003.  (See Exhibit G.)

104. By invoice dated July 28, 2003, Plaintiff billed Defendant the sum of $869.80 representing Defendant's share of the Pylon Sign Expenses for the time period April 1, 2003 through June 30, 2003.

105. Of that sum due for Defendant's share of the Pylon Sign Expenses for the period April 1, 2003 through June 30, 2003, Defendant paid $799.77.

106. Accordingly, the sum of $70.03 was still due and owing under the July 28, 2003 invoice for Defendant's share of the Pylon Sign Expenses for the period April 1, 2003 through June 30, 2003.

107. By a revised invoice dated April 13, 2004, Plaintiff billed Defendant for the balance of $70.03 still due and owing for Defendant's share of the Pylon Sign Expenses for the time period April 1, 2003 through June 30, 2003.

108. By invoice dated November 18, 2004, Plaintiff billed Defendant the sum of $2,498.73 representing Defendant's share of the Pylon Sign Expenses for the time period July 1, 2003 through December 31, 2003.  (See Exhibit G.)

109. Defendant has not paid the November 18, 2004 invoice for its share of the Pylon Sign Expenses for the period July 1, 2003 through December 31, 2003.

110. By invoice dated July 8, 2005, Plaintiff billed Defendant the sum of $4,249.54 representing Defendant's share of the Pylon Sign Expenses for the calendar year 2004. (See Exhibit G.)

111. Defendant paid the full amount due under the July 8, 2005 invoice for its share of the Pylon Sign Expenses for the calendar year 2004.

112. By invoice dated July 8, 2005, Plaintiff billed Defendant the sum of $658.15 representing Defendant's share of the Pylon Sign Expenses for the time period January 1, 2005 through March 31, 2005. (See Exhibit G.)

113. Defendant paid the entire sum of $658.15 billed for its share of the Pylon Sign Expenses for the period January 1, 2005 through March 31, 2005.

114. By invoice dated October 25, 2005, Plaintiff billed Defendant the sum of $483.35 representing Defendant's share of the Pylon Sign Expenses for the time period April 1, 2005 through June 30, 2005. (See Exhibit G.)

115. Defendant has paid no part of the October 25, 2005 invoice for its share of the Pylon Sign Expenses for the time period April 1, 2005 through June 30, 2005.

116. By invoice dated October 25, 2005, Plaintiff billed Defendant the sum of $498.89 representing Defendant's share of the Pylon Sign Expenses for the time period July 1, 2005 through September 30, 2005. (See Exhibit G.)

117. Defendant has paid no part of the October 25, 2005 invoice for its share of the Pylon Sign Expenses for the time period July 1, 2005 through September 30, 2005.

118. By invoice dated November 13, 2006, Plaintiff billed Defendant the sum of $10,218.47 representing Defendant's share of the Pylon Sign Expenses for the time period January 1, 2005 through December 31, 2005.  (See Exhibit G.)

119. The November 13, 2006 invoice for Pylon Sign Expenses includes $1,640.39 previously billed to Defendant for general Pylon Sign Expenses for the period January 1, 2005 through September 30, 2005.

120. Of the sum due for Defendant's share of the Pylon Sign Expenses for the period January 1, 2005 through December 31, 2005, Defendant paid $658.15, the amount previously billed for Defendant's share of the Pylon Sign Expenses for the period January 1, 2005 through March 31, 2005.

121. Thus, the sum of $9,560.32 remains due and owing under the November 13, 2006 invoice for Defendant's share of the Pylon Sign Expenses for the period January 1, 2005 through December 31, 2005.

122. By invoice dated August 6, 2007, Plaintiff billed Defendant the sum of $7,563.77 representing Defendant's share of the Pylon Sign Expenses for the time period January 1, 2006 through December 31, 2006.  (See Exhibit G.)

123. Defendant has paid no part of the August 6, 2007 invoice for its share of the Pylon Sign Expenses for the time period January 1, 2006 through December 31, 2006.

124. The amounts due for Pylon Sign Expenses detailed above are summarized in the following chart:

| Period Covered | Date of Invoice | Paragraphs of Complaint | Complaint Exhibit | Amount Past Due |
|---|---|---|---|---|
| 10/1/02 - 12/31/02 | 5/20/03 5/20/03 | 96-99 | G | $      10.56 |
| 1/1/03 - 3/31/03 | 7/28/03 7/28/03 | 100-103 | G | 161.33 |
| 4/1/03 - 6/30/03 | 7/28/03 7/28/03 | 104-107 | G | 70.03 |
| 7/1/03 - 12/31/03 | 11/18/04 | 108-109 | G | 2,498.73 |
| 1/1/05 - 12/31/05 | 7/8/05 10/25/05 10/25/05 11/13/06 | 112-121 | G | 9,560.32 |
| 1/1/06 - 12/31/06 | 8/6/07 | 122-123 | G | 7,563.77 |
| | | | | |
| Total: Pylon Sign | | | | $ 19,864.74 |

## The Invoices for Liability Insurance and Rent Insurance

125. By invoice dated July 28, 2003, Plaintiff billed Defendant the sum of $21,091.71 representing Defendant's share of liability insurance expenses for the year 2003.

126. Defendant paid the liability insurance expenses due for 2003.

127. By invoice dated July 8, 2005, Plaintiff billed Defendant the sum of $29,861.92 representing Defendant's share of liability insurance expenses for the year 2004.

128. Defendant paid the amount billed by Plaintiff for its share of liability insurance expenses for 2004.

129. By invoice dated October 25, 2005, Plaintiff billed Defendant the sum of $33,838.24 representing Defendant's share of liability insurance expenses for the year 2005.

130. A copy of the October 25, 2005 invoice for Defendant's share of liability insurance expenses for the year 2005 is annexed hereto as Exhibit H.

131. By invoice dated November 13, 2006, Plaintiff billed Defendant the total sum of $79,287.65 for its pro rata share of various expenses, which included $42,825.94 representing Defendant's share of liability insurance expenses for the year 2005. (See Exhibit F.)

132. The $42,825.94 billed in the November 13, 2006 invoice is the correct amount owed by Defendant for its share of liability insurance expenses for the year 2005.

133. Defendant has failed and refused to pay the amount billed for liability insurance expenses for the year 2005.

134. By invoice dated August 6, 2007, Plaintiff billed Defendant the total sum of $185,155.47 for its pro rata share of

various expenses, which included $42,483.92 representing Defendant's share of liability insurance expenses for the year 2006. (See Exhibit F.)

135. Defendant has failed and refused to pay the amount billed for liability insurance expenses for the year 2006.

136. By invoice dated August 6, 2007, Plaintiff billed Defendant the sum of $1,783.41 representing the cost of rent insurance for the year 2006 obtained in accordance with ¶ 12.B of the Lease. (A copy of the August 6, 2007 invoice for Defendant's share of the rent insurance expense for the year 2006 is annexed hereto as Exhibit I.)

137. Defendant has failed and refused to pay the amount billed for rent insurance for the year 2006.

138. The amounts due for liability insurance and rent insurance detailed above are summarized in the following chart:

| Period Covered | Date of Invoice | Paragraphs of Complaint | Complaint Exhibit | Amount Past Due |
|---|---|---|---|---|
| 1/1/05 - 12/31/05 | 10/25/05 11/13/06 | 129-133 | F, H | 42,825.94 |
| 1/1/06 - 12/31/06 | 8/6/07 | 134-135 | F | 42,483.92 |
| 1/1/06 - 12/31/06 | 8/6/07 | 136-137 | I | 1,783.41 |
| | | | | |

| Total Liability and Rent Insurance | | | | $ 87,093.27 |
|---|---|---|---|---|

## The Paid Invoices for Security Services

139. In conformity with the conditional final site plan approval granted by the Town of Monroe, Plaintiff entered into a contract with Hudson Valley Protective Services pursuant to which Hudson Valley Protective Services was to provide the private security required at the Shopping Center.

140. As set forth above, pursuant to the terms of the Lease, Plaintiff provided to Defendant invoices for Defendant's share of various CAM expenses, including those for security at the Shopping Center.

141. As set forth below, Defendant paid the invoices for its pro rata share of the security expenses at the Shopping Center for the time period October 11, 2000 through December 31, 2002.

142. By invoice dated August 20, 2001, Plaintiff billed Defendant for its pro rata share of various CAM expenses, which share included the sum of $30,586.81 for security expenses at the Shopping Center for the time period October 11, 2000 through December 31, 2000. (See Exhibit E.)

143. By invoice dated November 12, 2001, Plaintiff billed Defendant for its pro rata share of various CAM expenses,

which share included the sum of $83,072.07 for security expenses at the Shopping Center for the time period January 1, 2001 through June 30, 2001.  (See Exhibit E.)

144. By invoice dated November 12, 2001, Plaintiff billed Defendant for its pro rata share of various CAM expenses, which share included the sum of $28,702.37 for security expenses at the Shopping Center for the time period July 1, 2001 through September 30, 2001.  (See Exhibit E.)

145. By invoice dated June 22, 2002, Plaintiff billed Defendant for its pro rata share of various CAM expenses, which share included the sum of $45,341.50 for security expenses at the Shopping Center for the time period October 1, 2001 through December 31, 2001.  (See Exhibit E.)

146. By invoice dated June 29, 2002, Plaintiff billed Defendant for its pro rata share of various CAM expenses, which share included the sum of $34,012.10 for security expenses at the Shopping Center for the time period January 1, 2002 through March 31, 2002.  (See Exhibit E.)

147. By invoice dated August 26, 2002, Plaintiff billed Defendant for its pro rata share of various CAM expenses, which share included the sum of $34,252.11 for security expenses at the Shopping Center for the time period April 1, 2002 through June 30, 2002.  (See Exhibit E.)

148. By invoice dated October 25, 2002, Plaintiff billed Defendant for its pro rata share of various CAM expenses,

which shares included the sum of $40,556.97 for security expenses at the Shopping Center for the time period July 1, 2002 through September 30, 2002. (See Exhibit E.)

149. By invoice dated May 20, 2003, Plaintiff billed Defendant for its pro rata share of various CAM expenses, which shares included the sum of $30,717.78 for security expenses at the Shopping Center for the time period October 1, 2002 through December 31, 2002. (See Exhibit E.)

150. Defendant paid the above invoices for its share of security expenses at the Shopping Center from October 11, 2000 through December 31, 2002.

## The Unpaid Invoices for Security Services

151. As set forth below, Defendant failed and has refused to pay invoices for its pro rata share of security expenses at the Shopping Center for the time period January 1, 2003 through the present.

152. By invoice dated July 28, 2003, Plaintiff billed Defendant $31,053.96 for its pro rata share of various expenses, which share included the sum of $23,174.59 for security expenses at the Shopping Center for the time period January 1, 2003 through March 31, 2003. (See Exhibit F.)

153. By a revised invoice dated April 13, 2004, Plaintiff billed Defendant $33,419.80 for its pro rata share of various expenses, which share included the sum of $27,546.88 for

security expenses at the Shopping Center for the time period April 1, 2003 through June 31, 2003.  (See Exhibit F.)

154. By invoice dated November 18, 2004, Plaintiff billed Defendant $66,494.29 for its pro rata share of various expenses, which share included the sum of $51,644.16 for security expenses at the Shopping Center for the time period July 1, 2003 through December 31, 2003.  (See Exhibit F.)

155. By letter dated November 18, 2004, Plaintiff wrote to Defendant to provide Defendant with the calculation of the security expenses from January 1, 2003 through December 31, 2003 and to request that Wal-Mart REBT remit payment therefor.

156. A copy of the November 18, 2004 letter from Plaintiff to Defendant, without the enclosures thereto, is annexed hereto as Exhibit J.

157. To date, Defendant has failed and refused to pay the above security expenses from and after January 1, 2003.

158. By invoice dated February 1, 2005, Plaintiff billed Defendant the sum of $101,242.71 representing Defendant's pro rata share of the security expenses at the Shopping Center for the calendar year 2004.  (See Exhibit F.)

159. By invoice dated July 8, 2005, Plaintiff billed Defendant $35,718.71 for its pro rata share of various expenses, which share included the sum of $25,128.85 for security expenses at the Shopping Center for the time period January 1, 2005 through March 31, 2005.  (See Exhibit F.)

160. By invoice dated October 25, 2005, Plaintiff billed Defendant $50,596.06 for its pro rata share of various expenses, which share included the sum of $34,946.61 for security expenses at the Shopping Center for the time period April 1, 2005 through June 30, 2005.  (See Exhibit F.)

161. By invoice dated October 25, 2005, Plaintiff billed Defendant $20,594.08 for its pro rata share of various expenses, which share included the sum of $17,744.28 for security expenses at the Shopping Center for the time period July 1, 2005 through September 30, 2005.  (See Exhibit F.)

162. By invoice dated November 13, 2006, Plaintiff billed Defendant the sum of $98,500.25 representing Defendant's pro rata share of the security expenses at the Shopping Center for the calendar year 2005.  (See Exhibit F.)

163. Defendant has failed and refused to pay the amount billed for security expenses at the Shopping Center for the calendar years 2004 and 2005.

164. By invoice dated August 6, 2007, Plaintiff billed Defendant $185,155.47 for its pro rata share of various expenses, which share included the sum of $101,740.75 for security expenses at the Shopping Center for the calendar year 2006.  (See Exhibit F.)

165. Defendant has failed and refused to pay the amount billed for security expenses at the Shopping Center for the calendar year 2006.

166. By invoice dated September 2, 2007, Plaintiff billed Defendant $50,421.69 for its pro rata share of various expenses, which share included the sum of $46,667.91 for security expenses at the Shopping Center for the period January 1, 2007 through June 30, 2007.

167. Defendant has failed and refused to pay the amount billed for security expenses at the Shopping Center for the period January 1, 2007 through June 30, 2007

168. Defendant has not paid its pro rata share of the security expenses at the Shopping Center from January 1, 2003 to date.

169. The amounts due for security services detailed above are summarized in the following chart:

| Period Covered | Date of Invoice | Paragraphs of Complaint | Complaint Exhibit | Amount Past Due |
|---|---|---|---|---|
| 1/1/03 – 3/31/03 | 7/28/03 | 152 | F | 23,174.59 |
| 4/1/03 – 6/31/03 | 7/28/03 | 153 | F | 27,546.88 |
| 7/1/03 – 12/31/03 | 11/18/04 | 154 | F | 51,644.16 |
| 1/1/04 – 12/31/04 | 2/1/05 | 158 | F | 101,242.71 |
| 1/1/05 – 12/31/05 | 7/8/05 10/25/05 10/25/05 11/13/06 | 159-163 | F | 98,500.25 |
| 1/1/06 – 12/31/06 | 8/6/07 | 164-165 | F | 101,740.75 |

| 1/1/07 - 6/30/07 | 9/2/07 | 166-167 | F | 46,667.91 |
|---|---|---|---|---|
| Total Security Expenses | | | | $450,517.25 |

## Detention Pond Maintenance Expenses

170. By invoice dated November 13, 2006, Plaintiff billed Defendant the sum of $3,271.12 representing Defendant's share of the Detention Pond Maintenance Expenses for the calendar year 2005. (A copy of the November 13, 2006 invoice for Defendant's share of the Detention Pond Maintenance Expenses for the calendar year 2005 is annexed hereto as part of Exhibit K.)

171. Defendant has failed and refused to pay the amounts billed for Detention Pond Maintenance Expenses for the calendar year 2005.

172. By invoice dated August 6, 2007, Plaintiff billed Defendant the sum of $4,229.62 representing Defendant's share of the Detention Pond Maintenance Expenses for the calendar year 2006. (A copy of the August 6, 2007 invoice for Defendant's share of the Detention Pond Maintenance Expenses for the calendar year 2006 is annexed hereto as part of Exhibit K.)

173. Defendant has failed and refused to pay the amounts billed for Detention Pond Maintenance Expenses for the calendar year 2006.

174. The amounts due for Detention Pond Maintenance Expenses detailed above are summarized in the following chart:

| Period Covered | Date of Invoice | Paragraphs of Complaint | Complaint Exhibit | Amount Past Due |
|---|---|---|---|---|
| 1/1/05 - 12/31/05 | 11/13/06 | 170-171 | K | $ 3,271.12 |
| 1/1/06 - 12/31/06 | 8/6/07 | 172-173 | K | 4,229.62 |
| | | | | |
| Total Detention Pond Maint. Expense | | | | $ 7,500.74 |

**The February 2005 Letter**

175. By letter dated February 3, 2005, Plaintiff wrote to Defendant requesting payment for Defendant's share of the security expenses at the Shopping Center as well as other expenses due but unpaid by Defendant.

176. A copy of the February 3, 2005 letter from Plaintiff to Defendant, without the enclosures thereto, is annexed hereto as Exhibit L.

177. The amounts due from Defendant to Plaintiff as set forth in the February 3, 2005 letter include $101,242.71 for security expenses at the Shopping Center for 2004; $51,644.16 for security expenses at the Shopping Center for July 1, 2003 through December 31, 2003; $27,546.88 for security expenses for April 1,

2003 through June 30, 2003; $23,174.59 for security expenses at the Shopping Center for January 1, 2003 through March 1, 2003; $14,850.13 for general CAM expenses at the Shopping Center for July 1, 2003 through December 31, 2003; $21,091.71 for adjusted expense of general liability insurance for the year 2003; $2,498.73 for Pylon Sign Expenses for July 1, 2003 through December 31, 2003; $70.33 for the unpaid balance due for Pylon Sign Expenses for April 1, 2003 through June 30, 2003; $161.33 for the unpaid balance due for Pylon Sign Expenses for January 1, 2003 through March 31, 2003; and $10.56 for the unpaid balance due for Pylon Sign Expenses for October 1, 2002 through December 31, 2002.  (See Exhibit L.)

178. To date, Defendant has failed and refused to pay the amounts due as set forth in the February 3, 2005 letter.

## COUNT I

### (Breach of Contract – General CAM Expenses)

179. Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 - 178 hereof as if set forth fully herein.

180. Wal-Mart REBT has failed to pay the amounts due under the Lease for its pro rata share of the general CAM expenses the Shopping Center.

181. As a result of the foregoing, Defendant Wal-Mart REBT is in breach of its obligations under the Lease.

182. As a result of the foregoing, Defendant Wal-Mart REBT owes to Plaintiff an amount to be determined at trial, but in no event less than $96,667.13, with interest accruing from the date that such amounts came due.

## COUNT II

### (Breach of Contract - Pylon Sign Expenses)

183. Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 - 182 hereof as if set forth fully herein.

184. Wal-Mart REBT has failed to pay the amounts due under the Lease for its pro rata share of the Pylon Sign Expenses at the Shopping Center.

185. As a result of the foregoing, Defendant Wal-Mart REBT is in breach of its obligations under the Lease.

186. As a result of the foregoing, Defendant Wal-Mart REBT owes to Plaintiff an amount to be determined at trial, but in no event less than $19,864.74, with interest accruing from the date that such amounts came due.

## COUNT III

### (Breach of Contract - Liability Insurance)

187. Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 - 186 hereof as if set forth fully herein.

188. Wal-Mart REBT has failed to pay the amounts due under the Lease for its pro rata share of the liability insurance and rent insurance at the Shopping Center.

189. As a result of the foregoing, Defendant Wal-Mart REBT is in breach of its obligations under the Lease.

190. As a result of the foregoing, Defendant Wal-Mart REBT owes to Plaintiff an amount to be determined at trial, but in no event less than $87,093.27, with interest accruing from the date that such amounts came due.

## COUNT IV

### (Breach of Contract – Security Expenses)

191. Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 - 190 hereof as if set forth fully herein.

192. Wal-Mart REBT has failed to pay the amounts due under the Lease for its pro rata share of the security expenses at the Shopping Center.

193. As a result of the foregoing, Defendant Wal-Mart REBT is in breach of its obligations under the Lease.

194. As a result of the foregoing, Defendant Wal-Mart REBT owes to Plaintiff an amount to be determined at trial, but in no event less than $450,517.25, with interest accruing from the date that such amounts came due.

## COUNT V

### <u>(Breach of Contract - Detention Pond Maintenance Expenses)</u>

195. Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 - 194 hereof as if set forth fully herein.

196. Wal-Mart REBT has failed to pay the amounts due under the Lease for its pro rata share of the Detention Pond Maintenance Expenses at the Shopping Center.

197. As a result of the foregoing, Defendant Wal-Mart REBT is in breach of its obligations under the Lease.

198. As a result of the foregoing, Defendant Wal-Mart REBT owes to Plaintiff an amount to be determined at trial, but in no event less than $7,500.74, with interest accruing from the date that such amounts came due.

## COUNT VI

### <u>(Account Stated)</u>

199. Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 - 198 hereof as if set forth fully herein.

200. The letters from Plaintiff to Defendant constitute an account stated for the charges detailed therein.

201. As a result of the foregoing, Defendant Wal-Mart REBT owes to Plaintiff an amount to be determined at trial, but in no event less than $242,291.13, with interest accruing from the date that such amounts came due.

## COUNT VII

### (Declaratory Judgment - General CAM Expenses)

202. Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 - 201 hereof as if set forth fully therein.

203. There is an actual controversy between Plaintiff and Defendant as to the Defendant's obligations under the Lease to pay its pro rata share of the general CAM expenses at the Shopping Center.

204. Plaintiff is entitled to judgment declaring that Defendant Wal-Mart REBT is obligated under the terms of the Lease to pay its pro rata share of the general CAM expenses incurred by Plaintiff at the Shopping Center.

## COUNT VIII

### (Declaratory Judgment - Pylon Sign Expenses)

205. Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 - 204 hereof as if set forth fully therein.

206. There is an actual controversy between Plaintiff and Defendant as to the Defendant's obligations under the Lease to pay its pro rata share of the Pylon Sign Expenses at the Shopping Center.

207. Plaintiff is entitled to judgment declaring that Defendant Wal-Mart REBT is obligated under the terms of the Lease

to pay its pro rata share of the Pylon Sign Expenses incurred by Plaintiff at the Shopping Center.

## COUNT IX

### (Declaratory Judgment - Liability Insurance)

208. Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 - 207 hereof as if set forth fully therein.

209. There is an actual controversy between Plaintiff and Defendant as to the Defendant's obligations under the Lease to pay its pro rata share of the expenses for liability insurance covering the common areas at the Shopping Center.

210. Plaintiff is entitled to judgment declaring that Defendant Wal-Mart REBT is obligated under the terms of the Lease to pay its pro rata share of the expenses incurred by Plaintiff for liability insurance covering the common areas at the Shopping Center.

## COUNT X

### (Declaratory Judgment - Security Expenses)

211. Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 - 210 hereof as if set forth fully therein.

212. There is an actual controversy between Plaintiff and Defendant as to the Defendant's obligations under the Lease

to pay its pro rata share of the security expenses at the Shopping Center.

213. Plaintiff is entitled to judgment declaring that Defendant Wal-Mart REBT is obligated under the terms of the Lease to pay its pro rata share of the expenses incurred by Plaintiff for private security services at the Shopping Center.

## COUNT XI

### (Declaratory Judgment – Detention Pond Maintenance Expenses)

214. Plaintiff repeats and realleges the allegations set forth in ¶¶ 1 - 213 hereof as if set forth fully therein.

215. There is an actual controversy between Plaintiff and Defendant as to the Defendant's obligations under the Lease to pay its pro rata share of the Detention Pond Maintenance Expenses at the Shopping Center.

216. Plaintiff is entitled to judgment declaring that Defendant Wal-Mart REBT is obligated under the terms of the Lease to pay its pro rata share of the Detention Pond Maintenance Expenses incurred by Plaintiff at the Shopping Center.

**WHEREFORE**, Plaintiff demands judgment be awarded in its favor and against Wal-Mart REBT as follows:

A. On Count I, awarding Plaintiff damages against Wal-Mart REBT in an amount to be determined, but in any event not less than $95,996.43 plus interest;

B. On Count II, awarding Plaintiff damages against Wal-Mart REBT in an amount to be determined, but in any event not less than $19,864.74 plus interest;

C. On Count III, awarding Plaintiff damages against Wal-Mart REBT in an amount to be determined, but in any event not less than $87,093.27 plus interest;

D. On Count IV, awarding Plaintiff damages against Wal-Mart REBT in an amount to be determined, but in any event not less than $450,517.25 plus interest;

E. On Count V, awarding Plaintiff damages against Wal-Mart REBT in an amount to be determined, but in any event not less than $7,500.74 plus interest;

F. On Count VI, awarding Plaintiff damages against Wal-Mart REBT in an amount to be determined, but in any event not less than $242,291.13 plus interest;

G. On Count VII, declaring that Wal-Mart REBT is obligated under the terms of the Lease to pay its pro rata share of the general CAM expenses incurred by Plaintiff at the Shopping Center;

H.    On Count VIII, declaring that Wal-Mart REBT is obligated under the terms of the Lease to pay its pro rata share of the Pylon Sign Expenses incurred by Plaintiff at the Shopping Center;

I.    On Count IX, declaring that Wal-Mart REBT is obligated under the terms of the Lease to pay its pro rata share of the expenses incurred by Plaintiff for liability insurance covering the common areas at the Shopping Center;

J.    On Count X, declaring that Wal-Mart REBT is obligated under the terms of the Lease to pay its pro rata share of the expenses incurred by Plaintiff for security services at the Shopping Center;

K.    On Count XI, declaring that Wal-Mart REBT is obligated under the terms of the Lease to pay its pro rata share of the Detention Pond Maintenance Expenses incurred by Plaintiff at the Shopping Center; and

L.    Awarding Plaintiff such other, further and different relief as to this Court seems just, proper and equitable.

Dated:    New York, New York
          February 5, 2008

ARONAUER, RE & YUDELL, LLP

By: _____
    John C. Re (JR-7239)
    A member of the Firm
    Attorneys for Plaintiff
    444 Madison Avenue
    New York, NY 10022
    (212) 755-6000